IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JORGE ELIECER GONZALEZ-OCHOA,<br><br>    Defendant. | CRIMINAL NO. 3:25-CR-80<br><br>**RESPONSE TO GOVERNMENT'S BRIEF IN SUPPORT OF APPEAL OF ORDER DENYING MOTION FOR DETENTION** |

**TABLE OF CONTENTS**

I.   **Relevant factual background** ................................................................. **2**

II.  **Legal analysis** ........................................................................................... **4**

   A. **The Court did not err in finding that the government did not establish it was entitled to a detention hearing** ..................... **4**

   B. **The Court did not err in finding that there were conditions of release to reasonably assure Mr. Gonzalez-Ochoa's appearance** ........................................................................................... **6**

   C. **The *Nken* factors counsel against a stay** ....................................... **11**

On October 20, 2025, the Court held a detention hearing on the government's motion for detention. ECF No. 18. The Court took the matter under advisement, and thereafter, on December 3, 2025, denied the government's request. ECF No. 24. The Court found that the government failed to make a threshold showing that the government was entitled to a detention hearing, and that even if the government was

1

entitled to the hearing, that there were nonetheless conditions of release to reasonably assure Mr. Gonzalez-Ochoa's appearance. *Id.* at 2.

Following the order, on December 6, 2025, the government filed a notice of appeal and moved for a stay pending appeal. ECF Nos. 27-28. On the same day, the Court granted the government's motion for a stay. ECF No. 29. On December 8, 2025, Mr. Gonzalez-Ochoa filed a motion for reconsideration of the order granting the stay. ECF Nos. 30, 30-1. Thereafter, the government filed its brief in support of the appeal and also for the first time addressed the *Nken* factors in relation to its prior motion to stay release. ECF No. 33.

As explained in this response, the Court did not err in finding that both the government did not meet its threshold burden to seek a detention hearing and that in the alternative, there are conditions to reasonably assure Mr. Gonzalez-Ochoa's appearance. Related to this analysis, the Court erred in granting the government's motion to stay.

**I. Relevant factual background**

Mr. Gonzalez-Ochoa, 28 years of age, was born in Valledupar, Colombia. ECF No. 17 at 1. He lived in Colombia his whole life until October 2024, when he came to the United States. *Id.* In those 28 years, he had only one prior charge: Alien Inadmissibility out of Tucson, Arizona. *Id.* at 2. He was released on November of 2024 pending his immigration proceedings and had a GPS monitor. (T. at 8).[1] The GPS

---

[1] "T" refers to the transcript of the detention hearing, followed by a pincite to the page.

monitor was how "ICE was able to monitor and locate him." ECF No. 24 at 9.

Mr. Gonzalez-Ochoa was required to reside at a specific address, but the government's witness, Officer Jess Leibold, did not know the address. (T. at 8). Though Officer Leibold testified Mr. Gonzalez-Ochoa was residing at a different address, it was based on the case officer's report. (T. at 8-9).

Mr. Gonzalez-Ochoa was also supposed to check in with ICE and attend immigration hearings. (T. at 9). Officer Leibold did not know when exactly those hearings were set, but he believed "his court date was after the incident. It was still in the future." (T. at 9).

Mr. Gonzalez-Ochoa worked at the Bread Garden Market since May of 2025 until September, when he was apprehended by plain-clothes ICE agents. (T. at 13-14). The ICE agents could have worn a vest "that says 'Police' on the outside." (T. at 13).

The arrest was not based on any allegations of violence, but rather for allegedly providing a fake Social Security card and a lawful permanent resident card. (T. at 10).

Officer Leibold first learned of Mr. Gonzalez-Ochoa the day of the arrest. (T. at 10). Officer Leibold testified that ICE was taking steps to locate him but did not know what those steps were. (T. at 10). Based on his testimony, ICE discovered where Mr. Gonzalez-Ochoa was working and the alternate address he was residing at, but could not testify as to when ICE discovered that information. (T. at 10-11).

Officer Leibold testified that the plain-clothes ICE agents identified themselves to the Bread Garden manager, but could not testify if they identified themselves to Mr. Gonzalez-Ochoa. (T. at 12). During the arrest, there were members of the public who asked the ICE agents for identification. (T. at 12). The ICE agents did not identify themselves to those members of the public. (T. at 13).

Prior to the arrest, Mr. Gonzalez-Ochoa was residing with his significant other Mari Castro and their eight-month-old son. ECF No. 17 at 1. Mr. Gonzalez-Ochoa provided Ms. Castro's mother, Eva Sandith Castro Fuentes, as third party custodian. *Id.* Ms. Castro confirmed that her mother was willing to serve as third party custodian. *Id.*

## II. Legal analysis

### A. The Court did not err in finding that the government did not establish it was entitled to a detention hearing.

As relevant to this case, the Court may hold a detention hearing on the government's motion for detention if there is a "serious risk that such person will flee . . . ." 18 U.S.C. § 3142(f)(2)(A). "[A] 'serious risk of flight' under § 3142(f)(2)(A) is a great risk—beyond average—that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *United States v. Molina-Orantes*, 2025 WL 1177654, *5 (D. Oregon April 23, 2025) (quotation omitted).

The government relies on its proffer and the allegations of the indictment to argue that it was entitled to a detention hearing. *See* ECF No. 33 at 7-8. Neither basis

4

is persuasive.

As to the proffered information, the government ignores that Officer Leibold knew so little information about the case that the Court found he was not competent to testify as to the proffer. ECF No. 24 at 8. "Indeed, his testimony and lack of knowledge as to basic, material facts, undermines the government's proffer." ECF No. 24 at 8-9. The government never addressed in its appeal brief why the Court erred in so concluding. While the government, in a footnote, takes issue with the fact "the magistrate judge found problematic that Officer Leibold did not know the specific address that defendant provided to ICE officials," it did not address that Officer Leibold's lack of knowledge extended beyond just not knowing the specific address. ECF No. 33 at 10 n.1.

Beyond not knowing the address where Mr. Gonzalez-Ochoa was supposed to be residing, he also did not know if the ICE agents (in plain-clothes) ever identified themselves as agents to Mr. Gonzalez-Ochoa. Indeed, Officer Leibold testified they did *not* identify themselves to the members of the public that were present during the arrest. Officer Leibold also did not know what steps ICE was taking to locate Mr. Gonzalez-Ochoa.

The whole point of cross examining a government's witness is to at least get additional context or clarification from the government's proffer. If the government's agent cannot testify as to the information proffered by the government, the proffer itself should not serve as a basis for detention.

5

The government also makes a mountain out of a molehill regarding the fraud allegations in the indictment. *See* ECF No. 33 at 8 (arguing that Mr. Gonzalez-Ochoa "used fake documents and misrepresented his immigration status and identity to deceive his employer and attempt to avoid detection"). Contrary to the government's conclusory argument, it is at least just as likely that Mr. Gonzalez-Ochoa used those documents for their intended purpose—***to work***. Prior to being arrested, Mr. Gonzalez-Ochoa was residing with his significant other and their eight-month-old son. In any other context, the fact that Mr. Gonzalez-Ochoa was working and trying to provide for his family would be commended.

In any event, at least two additional factors support the fact that Mr. Gonzalez-Ochoa is not a serious flight risk. He has ties to the community and almost non-existent criminal history. *See United States v. Rodriguez-Rodriguez*, 2025 WL 1685830, *3 (D. Minn. June 16, 2025).

**B. The Court did not err in finding that there were conditions of release to reasonably assure Mr. Gonzalez-Ochoa's appearance.**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985) (en banc) ("The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention.").

*1. The nature and circumstances of the offense support release.*

The government argues that "[t]he nature of these charges shows crimes of

6

falsehood and deceit, and the defendant's willingness to break the law to avoid detection, even while under supervision by ICE." ECF No. 33 at 10. As explained above, the government points to no evidence that Mr. Gonzalez-Ochoa used fraudulent documents with the intent to avoid detection, rather than just using them to get employment to support himself and his family. Indeed, the government's proffer underscores this point. (T. at 7) ("As part of working at the Bread Garden, he provided them with a fraudulent name, a fraudulent Social Security card, and a fraudulent permanent resident card.").

In addition, Congress explicitly incorporated into the statute offenses that would support detention, but did not incorporate Mr. Gonzalez-Ochoa's charges. *See* § 3142(g)(1) (explaining that the Court should account for "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device").

The government does not point to any cases where, on these facts, courts have concluded that the nature and circumstances of the offense support detention. In any event, in *United States v. Tapia*, the district court denied the government's motion for revocation of the release order even though the defendant possessed a South Dakota identification card, provided a Puerto Rican birth certificate, and signed an application for a United States passport "under the name of Carlos R. Jiminez Ramos." 924 F. Supp. 2d 1093, 1094 (D. South Dakota 2013). Moreover, during the

7

investigation, law enforcement found a doctored permanent resident card with an identification number that "belonged to a Vietnamese immigrant . . . ." *Id.*

The *Tapia* court contrasted the facts of the case with those of *United States v. Mehmood*, 358 F. App'x 767 (8th Cir. 2010), in which the defendant was charged with "multiple violations, had used two separate aliases to apply for two separate social security cards . . . . possessed a Canadian social security card, maintained unreported bank accounts and property in Canada, and was a frequent international traveler." *Id.*

The nature and circumstances of the offense here more closely align with those in *Tapia*. While Mr. Gonzalez-Ochoa was indicted of several counts, there is a combined set of two documents, a social security card and a permanent resident card, both bearing the name Elijah Rodriguez. *See* ECF No. 33 at 11.

   *2. Assuming that the weight of the evidence points toward detention, it is not a strong factor in the analysis.*

The government claims that "the weight of the evidence against defendant is strong, which points to detention." ECF No. 33 at 11 (citing T. at 7). In making that argument, the government relies on its own proffer despite the fact that Officer Leibold knew so little about the case that the Court found that his testimony undercut the government's proffer. *See* ECF No. 24 at 8-9.

In any event, taking the government at their word that the weight of the evidence is strong, it does not mean much because while it is a factor to be considered, it is "the least important" of them all. *United States v. Townsend*, 897 F.2d 989, 994

(9th Cir. 1990) (quoting *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985)).

    *3. Mr. Gonzalez-Ochoa's history and characteristics strongly support release.*

In his time in the United States, Mr. Gonzalez-Ochoa has created strong ties to the community. He worked at the Bread Garden since May of 2025 until his arrest in September of the same year. When he was not working, he was residing with his significant other and their eight-month-old son. He also has extended family in the area, specifically his functional mother-in-law, who was willing to serve as his third party custodian.

His criminal history is basically non-existent, with only one prior arrest dating back to when he first entered the United States. Related to this, there is no evidence of any failures to appear or otherwise avoiding requirements imposed on him by any courts. Indeed, Officer Leibold testified that Mr. Gonzalez-Ochoa's immigration would be in the future. (T. at 9).

The government ignores all of this and instead homes in on a select few issues. Citing to *United States v. Abad*, 350 F.3d 793, 799 (8th Cir. 2003), the government notes that Mr. Gonzalez-Ochoa is a Colombian citizen. ECF No. 33 at 11. *Abad* involved a unique set of facts, including the defendant traveling from Florida to Iowa to commit sex crimes against a minor victim, a presumption of detention that while was rebutted, "remains for consideration[,]" and the defendant contacting a minor victim to "engage[] in web-cam sex with her while living at home with his family."

9

*Abad*, 350 F.3d at 798, 799.

Next, the government claims that "defendant did not comply with the rules of his release pending his removal hearing." ECF No. 33 at 11 (citing T. at 6-7). "[T]he GPS monitor showed that defendant resided at a different residence than what he reported to ICE and worked." *Id.* at 7. As undersigned counsel argued at the detention hearing, it is ironic that GPS monitoring, a condition imposed on him, is how the government links Mr. Gonzalez-Ochoa to other alleged violations. (T. at 23). The fact that ICE found him based on the GPS shows (a) that he was compliant with some conditions, and (b) that he is not a flight risk because he never tried to hide from ICE authorities.

Next, the government argues that "when ICE officers located defendant at his job, upon recognizing the officers, he immediately ran from them." *Id.* at 12. Allegedly, Mr. Gonzalez-Ochoa also resisted arrest. *Id.* The government ignores that Officer Leibold could not testify if the ICE agents ever identified themselves to him. What Officer Leibold testified to was that they did *not* identify themselves to the members of the public that were present during the arrest. The government makes too much of the post-*Miranda* interview brought up in the government's proffer because the government's officer barely knew the case and could not testify as to other basic, material facts. Even if the Court takes the government's proffer at face value, it still does not indicate much because the arrest was a highly stressful situation that in no way would be indicative of how Mr. Gonzalez-Ochoa would act on pretrial release. It

10

is frankly not relevant as to whether Mr. Gonzalez-Ochoa would attend his future court hearings.

Lastly, the government attempts to rely on the ICE detainer as another reason for why detention is appropriate. ECF No. 33 at 12 ("Additionally, given the ICE detainer, the defendant's immigration status is in a notably different position than when he was under immigration release, which he seems to recognize given his attempted flight from officers."). But "[t]he question of whether this court should order [Mr. Gonzalez-Ochoa] to be detained pending trial must be resolved pursuant to the BRA without regard to whether the Executive Branch might remove him from the country if he is released." *United States v. Villatoro-Ventura*, 330 F. Supp. 3d 1118, 1135 (N.D. Iowa 2018).

*4. The nature and seriousness of the danger to any person or to the community.*

"The Government has not alleged that [Mr. Gonzalez-Ochoa]'s release would put any person or the community in danger. Nor would the record support such an argument. This factor weighs in favor of pretrial release." *Villatoro-Ventura*, 330 F. Supp. 3d at 1138.

**C. The *Nken* factors counsel against a stay.**

Contrary to the government's arguments, the *Nken* factors do not support a stay. *See* ECF No. 33 at 12-14 (the government arguing in favor of keeping the stay in place).

The first two *Nken* factors—likelihood of success on the merits, and irreparable

harm—"are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also Kansas v. United States*, 124 F.4th 529, 533 (8th Cir. 2024) ("The most important factor is likelihood of success on the merits, although a showing of irreparable injury without a stay is also required." (quoting *Brakebill v. Jaeger*, 905 F.3d 553, 557 (8th Cir. 2018))).

"[I]t is not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 434 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)). Instead, the government must show "a *strong likelihood* of success on the merits . . . ." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (emphasis added) (citing *Brakebill*, 905 F.3d at 557).

Contrary to the government's position, at best their chance of success on the merits is negligible. The fact that the United States Probation Office agrees with the government does not change this calculus. The only judge that has so far looked at all the relevant evidence related to the issue of detention found in favor of release despite the probation office's recommendation.

"'The second *Nken* factor requires more than the mere possibility of irreparable injury. Irreparable harm must be both certain and great.' Importantly, 'where there is a low likelihood of success on merits, a movant must show a proportionally greater irreparable injury.'" *United States v. Abass*, 779 F. Supp. 3d 1, 8 (D.D.C. 2025) (cleaned up) (quotations omitted). If a defendant could be re-detained following a District Court's reversal of a release order, "harm to the government is not

12

irreparable . . . ." *Id.*

The government argues that it would suffer irreparable injury from removal, while outright ignoring that the same executive branch, just a different agency, is the one trying to remove Mr. Gonzalez-Ochoa. The government points to no cases whatsoever where any courts across the country have agreed with this proposition. In making this argument, the government also forgets that it made the opposite argument just months ago. *See Nat'l TPS Alliance v. Noem*, 2025 WL 2661556, *6 (9th Cir. Sept. 17, 2025) ("The Government contends that 'removal alone cannot constitute the requisite irreparable injury to justify a stay and the possibility of family separation is an unfortunate possible consequence of any removal proceeding.'").

The government also argues that it will suffer irreparable injury if "defendant is released from both federal custody and ICE custody, and flees supervision, like he fled from officers on the day of his arrest." ECF No. 33 at 14. The government again ignores that the reason why ICE even found Mr. Gonzalez-Ochoa was because he was compliant with arguably the main anti-flight condition: GPS monitoring. Additionally, Mr. Gonzalez-Ochoa has clear incentives to remain compliant, including his significant other and eight-month-old son. Lastly, Mr. Gonzalez-Ochoa was arrested while he was working, undercutting the government's position that he was hiding.

As to the third factor, the government claims that "the issuance of the stay will

13

not substantially injure defendant since the stay order would not keep defendant from release in the community. Defendant currently has an ICE detainer, and therefore, he would still remain in custody until those proceedings are resolved, causing no substantial injury." ECF No. 33 at 14. The government seems to operate under the assumption that ICE would keep him detained while arguing on the irreparable harm factor that ICE could release him. *See id.* The government's contradictory arguments highlight exactly why this determination must be made in a vacuum, because the Court ultimately will not know exactly what will happen in the immigration proceedings. In any event, "[t]he loss of liberty is a harm that is substantial. 'As recognized by other courts, loss of liberty for the time of pretrial detention is irretrievable regardless of the outcome at trial.'" *Abass*, 779 F. Supp. 3d at 8 (quoting *United States v. Khanna*, 703 F. Supp. 3d 1309, 1316 (N.D. Okla. 2023)).

As to the last factor, the government argues that "the public has an interest in prosecuting those who commit crimes, including crimes of dishonesty and fraud." ECF No. 33 at 14. Contrary to the argument's position, this factor also weighs against staying the release order.

> As discussed in the first Nken factor, Mr. Abass does not pose an articulable threat to the public's safety. See supra Part III.B.1. Moreover, 'pretrial detention comes at a cost. Taxpayers spend over $1 billion annually to jail defendants before trial.' McLean, 749 F. Supp. 3d at 169 n.1 (citing Freedom Denied). Mr. Abass's detention adds to this public cost. Further, '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.' Munchel, 991 F.3d at 1279 (quoting Salerno, 481 U.S. at 755, 107 S.Ct. 2095). 'Given the improbability that the government will satisfy its burden to show that [Mr. Abass] falls within a 'carefully limited exception,' the

14

public interest weighs in favor of revocation of the stay.' Khanna, 703 F. Supp. 3d at 1316.

*Abass*, 779 F. Supp. 3d at 10 (alterations in original).

Because the *Nken* factors do not weigh in favor of the stay, the stay should not remain in effect.

\*\*\*

The Court should affirm the order releasing Mr. Gonzalez-Ochoa pending trial and dissolve the stay.

Respectfully submitted,

FEDERAL DEFENDER'S OFFICE
CBI Bank & Trust Building
101 W. 2nd Street, Suite 401
Davenport, Iowa 52801-1815
TELEPHONE:  (563) 322-8931
TELEFAX:  (563) 383-0052
EMAIL: abdel_reyes@fd.org

By:  /s/*Abdel Reyes*
    **Abdel Reyes**
     Assistant Federal Defender
     ATTORNEY FOR DEFENDANT

cc: Kaitlyn R. Macaulay, AUSA

CERTIFICATE OF SERVICE
I hereby certify that on December 10, 2025, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.
      /s/     Natalie Gahan

15